# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2646 | **DATE** | 8/27/2002 |
| **CASE TITLE** | Jenni, Inc. vs. Illinois Dist. Council No. 1 of the International Union of Bricklayers and Allied Craftworkers, AFL-CIO, and Bricklayers and Stone Masons, Local Union No. 21 | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment (Doc. No. 22-1) is denied. As there are no material disputes to submit to a finder of fact and no basis on which to set aside the JAB award, Defendant's motion for summary judgment (Doc. No. 24-1) is granted. Judgment is entered in favor of Defendants and against Plaintiff.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

| | | |
|---|---|---|
| ETV | courtroom deputy's initials | |

number of notices **2**

AUG 2 8 2002 date docketed

docketing deputy initials MJP

8/27/2002 date mailed notice

ETV mailing deputy initials

**Document Number** 42

Date/time received in central Clerk's Office

DOCKETED

AUG 2 8 2002

| | | |
|---|---|---|
| JENNI, INC. | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 01 C 2646 |
| | ) | |
| ILLINOIS DISTRICT COUNCIL NO. 1 | ) | Judge Rebecca R. Pallmeyer |
| OF THE INTERNATIONAL UNION OF | ) | |
| BRICKLAYERS AND ALLIED | ) | |
| CRAFTWORKERS, AFL-CIO, and | ) | |
| BRICKLAYERS AND STONE MASONS, | ) | |
| LOCAL UNION NO. 21, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jenni, Inc. filed suit to vacate an arbitration award in favor of the Illinois District

Council No. 1 of the International Union of Bricklayers and Allied Craftworkers, AFL-CIO (the

"District Council") and the United Order of American Bricklayers and Stone Masons, Local Union

No. 21 ("Local 21") (together, the "Union" or "Defendant"). Plaintiff argues that the arbitration panel

exceeded its authority by hearing the dispute, the hearing was fundamentally unfair, and the panel

was biased in favor of the Union. The Union denies these allegations and counter-claimed to

enforce the award.

The parties have filed cross motions for summary judgment. For the reasons set forth

below, Plaintiff's motion for summary judgment is denied and Defendant's motion is granted.

## FACTS[1]

Plaintiff is a bricklayer or mason contractor engaged in the business of construction.

---

[1]     The motions for summary judgment were filed with statements of material fact
pursuant to L.R. 56.1(a)(3). For each motion, the opposing party filed a response admitting or
disputing every factual allegation, pursuant to L.R. 56.1(b)(3)(A), and setting forth additional
material facts, pursuant to L.R. 56.1(b)(3)(B). In addition, (among other filings) each party
responded to the L.R. 56.1(b)(3)(B) statements of additional facts, and each party filed a reply to
the L.R. 56.1(b)(3)(A) responses. Except as otherwise necessary, the court will cite to the L.R.
56.1(a) factual statements included by each party with its own motion for summary judgment,
("Defs. Stmt." and "Pls. Stmt."), the 56.1(b)(3)(A) responses, ("Pls. Response Stmt." and "Defs.
Response Stmt."), and replies, ("Defs. Reply Stmt." and "Pls. Reply Stmt.").

(Plaintiff's Rule 56.1 Statement of Material Facts (hereinafter, "Pls. Stmt.") ¶ 5.) Defendant District Council is a labor organization affiliated with the AFL-CIO and is comprised of various local unions including Defendant Local 21. (*Id.* ¶ 6.) The parties signed a collective bargaining agreement which provides for arbitration of their disputes before a joint arbitration board (the "JAB"). (Statement of Uncontested Facts in Support of Union Motion for Summary Judgment (hereinafter, "Defs. Stmt.") ¶¶ 4-5, 10; 3/28/00 Memorandum of Understanding between Jenni and the District Council ("Memo. of Understanding"), Ex. A to Defs. Stmt.; 2000 Joint Agreement between Mason Contractors Association and the District Council ("2000 Agreement"), Ex. B to Defs. Stmt., at 27.) This case arises from an award entered on December 18, 2000, in which the JAB found that Plaintiff had performed at least 2,080 hours of unreported bargaining unit work in violation of the terms of the parties' collective bargaining agreement. (12/18/00 JAB Written Award ("Written Award"), Ex. C to Defs. Stmt.) The JAB ordered Plaintiff to pay a total of $58,622.94 in damages, to be distributed among various Union fringe benefit trust funds, the District Council, and Local 21. (*Id.*)

Plaintiff makes three main arguments as to why the JAB award should be vacated. First, Plaintiff claims that the JAB exceeded its contractual authority by hearing the dispute and ruling in the Union's favor. (Memorandum in Support of Plaintiff's Motion for Summary Judgment (hereinafter, "Pls. Motion"), at 9-10.) Second, Plaintiff argues that the JAB failed to afford it a fundamentally fair hearing. (*Id.* at 11-12.) Third, Plaintiff claims that the JAB was biased or partial in favor of the Union. (*Id.* at 13.)

On March 28, 2000, Plaintiff entered into a "Memorandum of Understanding," a short form collective bargaining agreement with the District Council, which has remained in effect since it was signed. (Memo. of Understanding.) The Memorandum of Understanding signed by Plaintiff included a clause binding Plaintiff to the substantive terms of master collective bargaining agreements negotiated from time to time between the District Council and various employer associations ("Association Agreements"). (Defs. Stmt. ¶ 6.) When Plaintiff signed the

2

Memorandum of Understanding, the then-current Association Agreement was effective for the period of June 1, 1996 through May 31, 2000. The 1996 Agreement was extended and amended by an Association Agreement effective for the period of June 1, 2000 through May 31, 2004. (2000 Agreement.)[2]

Article IV, section 4.1 of the Association Agreements requires Plaintiff's employees to join the Union as a condition of employment and to remain members in good standing. (2000 Agreement, at 3.) Article V, section 5.1 provides that the terms of the Agreements shall apply to all work within the Union's trade jurisdiction and that all work must be performed by bargaining unit members. (*Id.*, at 3-4.) Article VII, section 7.4 of the Association Agreements sets forth the wage rates and fringe benefit fund contributions required for all bargaining unit work. (*Id.*, at 10-11.)

The parties agree that Article XII, sections 12.1 and 12.2 of the Association Agreements creates a grievance mechanism culminating in the presentation of disputes before a joint arbitration board (the "JAB"). (Defs. Stmt ¶ 10; Plaintiff's Response to Union's Statement of Uncontested Facts ("Pls. Resp.") ¶ 10.) Section 12.1 provides that "[i]n case a dispute shall arise between an Employer and the Union, and the Employer and the Union cannot resolve the dispute" it will be referred to the JAB. (2000 Agreement, at 27.) Based on this language, Plaintiff argues the Agreements contemplate that parties must attempt to resolve a dispute informally before taking it to the JAB. (Plaintiff's Reply to Defendant's Responses to Pls. Stmt. ("Pls. Rep."), at ¶ 32.) Article XII, section 12.2 prescribes the membership of the JAB as consisting of four representatives (changed to "appointees" in the 2000 Agreement) for the Union and four for the Employer. (2000 Agreement, at 27.) The 1996 version provided that the JAB would be deemed to have failed to reach a decision if it did not do so within 72 hours after the dispute was referred. This requirement

---

[2]     Plaintiff adopted "CBA" (collective bargaining agreement) as the short form for the Association Agreements, and distinguished between the "1996-2000 CBA" and the "2000-2004 CBA." Defendant by and large refers to the two together as the "Association Agreement." The court will refer to the 1996 and 2000 Agreements together as the "Association Agreements," and distinguish between the two as necessary.

was eliminated in the 2000 Agreement. A new provision in the 2000 Agreement requires that all grievances not filed within 90 days of date of occurrence would be deemed waived. (*See* 1996 Agreement, Ex. 1 to Pls. Stmt.; 2000 Agreement.)

Another new provision in the 2000 Agreement, in Article XII, section 12.7, gives the JAB "full power to enforce this Agreement and [to] impose such awards, orders, damages, fines, sanctions, and other remedies as [it] deem[s] appropriate." (2000 Agreement, at 29.) In both versions of the Agreement, Article XXV, section 25.4D provides that if an employer is found not to have paid all wages and fringe benefit fund contributions as required by the contract, the employer will be liable for the underlying obligations and for legal fees and expenses incurred in any enforcement proceedings. (*Id.*, at 38; 1996 Agreement, at 36.)

On April 11, 2000, Pete Marinopoulos, president of the District Council, sent three letters to Plaintiff regarding possible violations of section 4.1 of the 1996 Agreement. (4/11/00 Letters from Marinopoulos to Jenni, Exs. 2A, 2B, and 2C to Pls. Stmt.) Marinopoulos sent three essentially identical letters to Plaintiff with regard to different employees on August 1, August 4, and September 14, 2000. (8/1/00, 8/4/00, and 9/14/00 Letters from Marinopoulos to Jenni, Exs. 2D, 2F, and 2G to Pls. Stmt.) In each of his six letters, Marinopoulos wrote that it had been brought to his attention Plaintiff might not be in compliance with the contract, quoted section 4.1 of the Association Agreement, and identified the individual employee or employees to which he referred. The Union claimed that Plaintiff employed the fourteen individuals named in the letters, but had failed to deduct from their paychecks and forward to the Union membership the dues required by section 4.1 of the Agreement.[3] The parties dispute whether these letters were "grievances," or otherwise notices of a claim arising from the contract. (Pls. Stmt. 14-18, 26-30; Defs. Response Stmt. ¶¶ 14-18, 26-30.) This dispute is part of more relevant disagreement as to the quality and

---

[3] No further detail regarding the merits of the section 4.1 disputes are relevant to this case because Defendant is not seeking to enforce that portion of the JAB award. (Defs. Response Stmt. ¶ 14.)

significance of a letter the District Council sent to Plaintiff on October 10, 2000.

In that letter of October 10, the District Council informed Plaintiff that a hearing would be held before the JAB on October 25, 2000 to consider claims that Plaintiff was in violation of sections 4.1, 5.1, and 7.4 of the contract. (Letter to Holzman from Marinopoulos of 10/10/00, Ex. 4 to Pls. Stmt. (hereinafter, "October 10 Letter").) The parties dispute whether this letter constituted a claim that Plaintiff had violated sections 5.1 and 7.4 of the 2000 Agreement. Plaintiff argues that the letter merely provided notice that a hearing had been set for October 25 and that the six prior letters regarding section 4.1 violations were the only claims it ever received.[4] (Pls. Stmt. ¶ 32.) Defendant contends that by listing all three provisions, the October 10 Letter provided notice of claims against Plaintiff under all three provisions. (Defs. Response Stmt. ¶ 32.) It is not disputed, however, that prior to the October 10 Letter the Union had never advised Plaintiff of any dispute under sections 5.1 and 7.4, nor did the Union ever try to resolve any such dispute informally as Plaintiff claims is required by section 12.1 of the 2000 Agreement. (Pls. Reply Stmt. ¶ 32.)

Plaintiff's receipt of the October 10 Letter was delayed until October 23, 2000 because Plaintiff's president, Paul Holzman, had moved. (2/13/02 Declaration of Jenni President Paul Holzman ("Holzman Decl."); Ex. 2 to Pls. Stmt.) Holzman responded with a letter to Marinopoulos[5] stating that he needed more time and requesting a continuation until the next JAB meeting. (Letter from Holzman to Marinopoulos, Ex. 2I to Pls. Stmt.) Holzman also wrote, "I find that the charges are to[o] vague and ask that you please provide me with detailed charges and detailed documentation supporting same so that I may prepare a defense." (*Id.*) On October 25, 2000 Holzman appeared before the JAB and requested a postponement, to which the District Council

---

[4]    Plaintiff makes this distinction in an attempt to show that the section 7.4 claims were not properly submitted to the JAB and that the hearing afforded Plaintiff was unfair. (*See* Pls. Stmt. ¶ 32.)

[5]    Holzman's letter is not dated and although the relevant factual statement is undisputed, it does not distinguish between Holzman's statements at the October 25 hearing and those contained in his letter. (*See* Pls. Stmt. ¶ 34.) The court therefore cannot tell whether Holzman's letter was written after receiving Marinopoulos's notice but before the hearing, or after the October 25 hearing.

agreed. (Defs. Stmt. ¶ 14; Pls. Stmt. ¶ 33.) Holzman also stated that he did not understand the notice, and was told by the JAB to contact the Union with his questions. (12/27/00 Deposition of Jim Fialkowski ("Fialkowski Dep."), at 64-65.) The hearing was continued to December 18, 2000. (Pls. Stmt. ¶ 35; Defs. Resp. Stmt. ¶ 35.)

Angelina Mieliulis, a District Council employee who reports directly to Marinopoulos, took notes at the October 25 hearing. (12/18/01 Deposition of Angelina Mieliulis ("Mieliulis Dep."), Ex. 6 to Pls. Stmt., at 6, 25.) About two days prior to that hearing, Mieliulis prepared a "JAB Violation Review Sheet." (*Id.,* at 25.) The document includes a section for "Charging Party." (Ex. 1 to Mieliulis Dep. (hereinafter "October 25th Violation Sheet").) Without specifically linking any particular party to any particular charge, Mieliulis listed four individuals in the Charging Party section: Jim Allen, John Thompson, Mike Lowery, and Jim Fialkowski. (*Id.*) Jim Allen is not mentioned by the parties again, and his name was crossed off a later version of this document that had been printed out for the next hearing, presumably by Mieliulis. John Thompson and Mike Lowery are Business Agents employed by Local 21. (3/15/02 Declaration of John Thompson, attached to Defs. Response Stmt., ¶ 11; 3/15/02 Declaration of Mike Lowery, attached to Defs. Response Stmt, ¶ 1.) As discussed below, Thompson and Lowery gave information to Mieliulis regarding the section 4.1 claims, and Lowery presented information to the JAB regarding those claims.

Jim Fialkowski is a trust representative of the Masonry Institute, Bricklayers Local 21 Pension and Apprentice and Trainee Program fund. (Fialkowski Dep., at 5.) The Masonry Institute is the fringe benefit fund that provides health and welfare services to members of Local 21; it also serves as the administrative arm for all the benefit funds for Local 21 members. (3/15/02 Declaration of Pete Marinopoulos, attached to Defs. Response Stmt. ¶ 11.) Although he did work for the District Council as an organizer until May 1999, Fialkowski is not employed by Local 21 or the District Council. (Fialkowski Dep., at 10-11.) As discussed below, Fialkowski was the only individual to present information to the JAB regarding the section 7.4 claims.

The "Violation(s)" section of the October 25th Violation Sheet referenced the same three provisions as the October 10 Letter: Article IV, Section 4.; Article V, Section 5.1, and Article VII, Section 7.4. Under "1st Notification Sent," Mieliulis listed "4-11-00, 8-1-00, 8-4-00, & 9-14-00." Under "2nd Notification Sent," she listed "10-10-00." (October 25th Violation Sheet.)

The Violation Sheet also includes a section for the "Relief or Remedy Sought," which Mieliulis explained is intended "basically to give the mediator an idea of what the charging parties are looking to recover from the Joint Board." (Mieliulis Dep., at 28.) Mieliulis explained that she ordinarily obtains the information for this section by "go[ing] to the charging parties to ask what they want as a remedy to the case." (Id., at 34.) In the October 25th Violation Sheet, the remedy sought was $8,750 ($635 for each of the fourteen individuals identified in the section 4.1 letters sent to Plaintiff).[6] (October 25th Violation Sheet.) This remedy was based on conversations Mieliulis had with Mike Lowery and John Thompson and on the six letters that had been sent to the Plaintiff in April, August, and September, 2000 regarding violations of section 4.1. (Mieliulis Dep., at 54.) Mieliulis testified that she had spoken to Fialkowski regarding the section 7.4 claim[7] prior to preparing the document, but he did not have numbers ready to give to her at that time. (Id., at 54.)

Mieliulis brought a printed copy of the October 25th Violation Sheet to the hearing. During the course of the hearing, she did not add any information or make any changes to the "Remedy Sought" section. (October 25th Violation Sheet.) The only notations she made were to record Paul Holzman as "Company Representative Present," and to indicate that "Disposition or Settlement"

---

[6]    The court notes that a $635 remedy for each of 14 individuals would amount to $8,890, not the requested $8,750. The $140 disparity between these amounts gives rise to the inference that someone multiplied the fourteen individuals by $625 and not $635.

[7]    The parties typically refer to the claim presented by Fialkowski as the section 7.4 claim, and the court will as well. The claim itself, for under-reporting bargaining unit hours and failing to make required contributions to Union fringe benefit funds, is in effect for violations of section 5.1 which requires that all bargaining unit work to be done by Union members and in accord with the other terms of the Association Agreement. Section 7.4 is the basis for the calculation of damages.

was postponed until the next hearing. (*Id.*)

By letter of November 24, 2000, the District Council informed Plaintiff that the hearing would take place on December 18, 2000. (Defs. Stmt. ¶ 14.) Despite Holzman's request in his October letter, Defendant did not provide him with any additional information regarding the pending claims. (Holzman Decl. ¶ 17.)

Prior to the December 18, 2000 hearing, Mieliulis made only a few changes to the October 25th Violation Sheet. (December 18th Violation Sheet, Ex. 2 to Mieliulis Dep.) She again did not include a calculation of damages associated with the section 7.4 underreporting claim in the remedies section because she did not get a chance to talk to Fialkowski before the hearing. (Mieliulis Dep., at 34; December 18th Violation Sheet.) She did include a reference to 11-24-00 as the date of another "second notification" (she had already listed 10-10-00 as a "second notification" prior to the October 25 hearing). (December 18th Violation Sheet.) She also included a notation that the JAB had granted a continuance on October 25, 2000. (*Id.*; Mieliulis Dep., at 53.)

On December 18, 2000, the JAB met to consider the claims against Plaintiff. (Written Award.) Lowery and Fialkowski appeared before the JAB in support of the claims, and Holzman appeared on Plaintiff's behalf. (*Id.*) Henry Kramer, the business manager of one of the Union locals (Local 74), was also present as a mediator. (Fialowski Dep., at 18-19; Mieliulis Dep., at 18, 49.) The JAB on December 18 was composed of Richard Lauber, Mark Larsen, Peter Culver, and William Wells. (*Id.*, at 19-20; Written Award.) Lauber and Larsen served as employer appointees, Culver and Wells as Union appointees. (*Id.*)

Richard Lauber is president of J & E Duff, Inc., a mason contractor that performs work in the Chicago area, and in addition, is the current president of the Mason Contractors Association of Greater Chicago. (1/14/02 Deposition of Richard H. Lauber ("Lauber Dep."), Ex. 7 to Pls. Stmt., at 5, 9.) J & E Duff competes for work with every mason contractor in Chicago. (*Id.*, at 12.) Lauber has served as a member of the JAB before, but has not received any special training as an arbitrator. (*Id.*, at 8.) From past involvement in JAB service and other labor-management

matters, Lauber has known Union representatives Thompson, Lowery, and Fialkowski for several years. (*Id.*, at 32-34.) Lauber did not disclose these relationships (which do not include social contacts) to Plaintiff. (Holzman Decl. ¶ 23.)

Mark Larsen is president of Thorleif Larsen & Son, a masonry construction company that works primarily in the Chicago metropolitan area on industrial and commercial projects. (1/14/02 Deposition of Mark Leif Larsen ("Larsen Dep."), Ex. 8 to Pltf. Stmt., at 6-7.) Larsen testified that he also knows the various union officials involved in this matter and the JAB appointees who sat with him, but does not socialize with any of them, nor with Fialkowski. (*Id.*, at 50-51.)

The Mason Contractors Association supplies the arbitrators for the employer appointee spots on the JAB. (Lauber Dep., at 14.) In this case, Marinopoulos told Mieliulis to contact Lauber to serve on the JAB. (Mieliulis Dep., at 20.) She did so, and asked Lauber to choose another person to serve with him; Lauber told her to call Larsen. (*Id.*) Plaintiff claims this process should have been disclosed to it. (Pls. Motion, at 13.) Defendant points out that the practice for selecting the employer appointees to the JAB has long been to give a spot to the president of the Mason Contractors Association (Lauber) and to allow him or her to designate who should fill the other spot. (Marinopoulos Decl. ¶ 10; Lauber Dep., at 14-16; Larsen Dep., at 17-18.) Plaintiff argues that, because no prior disputes involving it had come before the JAB, the practice of giving the Association president a spot as an employer appointee is not relevant.[8] (Pls. Reply Stmt. ¶ 41.) Plaintiff notes two other individuals that Mieliulis could have contacted to serve on the JAB instead of Larsen or Lauber. (Pls. Stmt. ¶ 45.)

Mike Lowery, a business agent for Local 21, presented Defendant's argument that Plaintiff

---

[8]     Neither party makes any clear argument concerning Art. XII, section 12.2 of the Association Agreement, which provides that employer appointees shall be designated by the Northern Illinois Mason Employers Council. Defendant does allude to "individuals appointed pursuant to the contract," (Union's Reply Memorandum in Opposition to Company's Motion to Summary Judgment, at 10), but neither party provides the court with information sufficient to determine whether the selection of the employer appointees technically complies with the 2000 Agreement.

breached section 4.1 of the Association Agreement, and owed the Union membership dues for a number of employees. (Mieliulis Dep., at 30.) JAB member Lauber suggested that Lowery and Holzman try to work out the matter between themselves. (Id., at 31; Fialkowski Dep., at 69-70.)

The second claim presented against Plaintiff at the hearing involved alleged violations of section 7.4 of the Agreement: specifically that Plaintiff had under-reported the hours of bargaining unit work performed at certain of its job sites and thus deprived the Union and its members of wages and contributions to various fringe benefit funds. (Fialkowski Dep., at 65-66.) Jim Fialkowski was the only person to present information to the JAB regarding this claim. (Id., at 65, 81.) As noted above, Fialkowski is a representative of various Union trust funds, but is not an employee of Local 21 or the District Council. As a trust representative, Fialkowski reports to trustees, including among others, Marinopoulos (president of the District Council) and Lauber.[9] (Id., at 11-12.) Fialkowski interviewed with Lauber to obtain his position as trust representative, and he has known both Lauber and Larsen for approximately two and a half years. (Id. at 15.) In addition, Fialkowski has known the Union appointees to the JAB and the Union mediator, Henry Kramer, for about five and a half years. (Id., at 18-19.)

In support of this second claim against Plaintiff, Fialkowski presented information about jobs completed by Plaintiff during the applicable period, along with photographs, measurements, and other data which he asserted could be used to determine the minimum number of hours of bargaining unit work that Plaintiff would have had to utilize to perform those jobs. (Fialkowski Dep., at 87-93, 96, 100-08, 119-123.) Fialkowski then presented reports submitted by Plaintiff to the fringe benefit trust funds on the number of hours of bargaining unit work Plaintiff claimed had been performed during this period. (Id., at 70, 96, 101.) He argued, based on his calculations of the minimum hours necessary to complete the jobs, that Plaintiff had under-reported bargaining unit

---

[9]     Although Plaintiff is suspicious of Fialkowski's reporting relationship with Lauber, the court notes that Plaintiff identified Clair Esche as one of the two employer representatives who could have served on the JAB in lieu of Lauber or Larsen. (Pls. Stmt. ¶ 45.) Yet Ms. Esche herself is one of the trustees to whom Fialkowksi reports. (Fialowski Dep., at 11.)

work. (*Id.*) It is undisputed that the under-reporting claim was based on estimates of work done by Plaintiff at various job sites dating back to the time when Plaintiff first signed the Memorandum of Understanding at the end of March 2000 and running through December 18, 2000. (*Id.*, at 32-33.) It is also undisputed that Fialkowski suspected as early as May or June 2000 that Plaintiff's reporting was not accurate.[10] (*Id.*, at 48-49.)

Defendant further concedes that prior to the December 18 hearing, neither Fialkowski nor any other representative had provided Plaintiff with any information or evidence relating to the under-reporting claim. (Defs. Response Stmt. ¶ 55; Fialowski Dep., at 72-73.) In fact, no Union representative had asked Fialkowski to attend either the October or the December JAB hearing, and he did not tell anybody that he planned to attend the hearings. (*Id.* at 84, 101.)

At the hearing, Fialkowski distributed pictures, monthly reports and estimates to Holzman and the JAB members. (*Id.*, at 87-93, 96, 100-08, 119-23.) Fialkowski had prepared a "cheat sheet" of notes for his own use in presenting the information; he did not provide that document to Holzman or the JAB members. (*Id.*, at 71.) Holzman was given an opportunity to respond to Fialkowski's allegations and evidence. (9/5/01 Deposition of Paul Holzman ("Holzman Dep."), attached to Defs. Stmt., at 73.) He told the JAB that he did not know that the matters raised by Fialkowski were going to be discussed at the hearing, and that he was not prepared to respond to any of the claims made by Fialkowski. (*Id.*, at 70-75.) Holzman asked for a continuance, but, Holzman asserts, Henry Kramer, a Union mediator, told him to "shut up . . . this is what we're doing."[11] (Holzman Decl. ¶ 21.)

---

[10] The parties provided further information regarding Fialkowski's methodology, how, when and where he gathered information, the use of similar evidence at past hearings, and the propriety of Fialkowski's conduct in gathering information against Plaintiff in the absence of employee complaints. (Pls. Stmt. ¶¶ 54-66, 72; Defs. Response Stmt., Additional Facts ¶¶ 1-3, 7-8.) Plaintiff also set out a chain of facts suggesting Fialkowski may have had a "personal vendetta" against Plaintiff. (Pls. Stmt. ¶ 92; Pls. Reply Stmt. ¶ 92.) As none of the added detail is relevant, however, the court does not include it.

[11] There is considerable dispute over whether this statement was made, and if so, by whom. For purposes of ruling on the summary judgment motion for Defendant, the court would necessarily assume that it was made by Kramer as alleged. Defendant focuses on Holzman's

(continued...)

Plaintiff emphasizes that Holzman asked Fialkowski at the hearing whether the under-reporting claim was the reason that Fialkowski had been seen counting material on job sites, but Fialkowski did not respond. (Fialkowski Dep., at 71-72) It appears from Holzman's own testimony on the matter that he was making a comment, not asking a question. (Holzman Dep., at 72-73 ("I said that it had been reported to me that he had been out counting block on one of the jobs.").) Fialkowski also declared that he did not answer because he did not think Holzman was looking for an answer and Holzman did not ask him to respond. (3/14/02 Declaration of Jim Fialkowski, attached to Defs. Resp. Stmt. ¶ 3.)

After the presentations were made, Kramer asked all people other than members of the panel to leave the room. (Fialkowski Dep., at 72-73) After about five minutes of deliberation, the JAB recalled everyone and "rendered its award" verbally. (Defs. Stmt. ¶ 21; Pls. Response Stmt. ¶ 21.) Defendant's undisputed characterization of the JAB's ruling was as follows:

> The JAB found that [Plaintiff] was in violation of various terms of the contract and concluded that [Plaintiff] had performed at least 2,080 hours of bargaining unit work contrary to the terms of the collective bargaining agreement, and ordered [Plaintiff] to pay a total of $58,622.94 as damages for those violations, to be distributed among various fringe benefit trust funds, [the District Council], and Local 21; indicated that if the Union or benefit funds obtained evidence of additional work being performed in violation of the contract, a new grievance could be filed and a further award would be considered; and provided that if [Plaintiff] did not abide by the award and legal action were taken to enforce it, [Plaintiff] would be responsible for reimbursing the union and/or the funds for all reasonable costs and legal fees and for interest on all amounts due at the rate of 10% a year from the original date

---

(...continued)
statement, "So in essence, I felt that they were basically telling me, 'Shut up, and this is what we're doing.'" (Holzman Dep., at 66.) Defendant argues that this was Holzman's impression of what was going on – his way of saying that the panel was not giving proper consideration to what he was saying. (Defs. Reply Stmt. ¶ 18; Defs. Response Stmt. ¶ 70.) Although Defendant accurately quotes Holzman, the follow-up question asking Holzman who made the statement, and Holzman's answer, "I don't recall the guy's name. I don't know who he is," give the impression that, notwithstanding some imprecision in his testimony, he was indeed claiming someone had made an actual statement to him. (Holzman Dep., at 66-67.) Holzman clarified his testimony by way of declaration: "When my deposition was taken on September 19, 2001, I did not know the identify of the person who told me to 'shut up, this is what we're doing.' On September 24, 2001, I appeared at the Union's office and I saw the man . . . . At this time this man's identity was revealed to me as Henry Kramer." (5/4/02 Declaration of Paul Holzman ("Holzman Decl."), attachment to Plaintiff's Response to Union's Supplement or Revisions to Previous Submissions, at ¶ 3.)

set for hearing, October 25, 2000, to the date of payment.

(Defs. Stmt. ¶ 23; Pls. Response Stmt. ¶ 23.)

Although it reached a decision at the December 18 hearing, the JAB also told Holzman that he had the right to submit additional material or information in support of his position within two weeks, which the JAB would consider and based on which the JAB might revise its award. (Larsen Dep., at 28, 51-52; Fialkowski Dep., at 74, 124.) The parties dispute what portions of the award Plaintiff was invited to attack. Plaintiff argues that it was given time only to submit documentation, and only such documentation as would show that certain brick washing work was not performed by Plaintiff. (Pls. Reply Stmt. ¶ 71; Larsen Dep., at 28.) Defendant argues the JAB put no such restriction on the portions of the award it was willing to reconsider. (Defs. Response Stmt. ¶ 74; Larsen Dep., at 28, 51-52; Fialkowski Dep., at 74.) Either way, it is undisputed that Holzman did not submit anything to the JAB or the Union within that two-week window. (3/15/02 Declaration of Angelina Mieliulis ("Mieliulis Decl."), attached to Defs.' Resp. Stmt. ¶ 8.)

On January 10, 2001, Holzman sent a letter to Marinopoulos "in response to charges presented at the Joint Arbitration Board Meeting of December 18, 2000." (1/10/01 Letter to Holzman to Marinopoulos ("1/10/01 Holzman Letter"), Ex. 2J to Pls. Stmt.) He first addressed the dues issue. (*Id.*) With regard to the under-reporting claim, Holzman wrote:

> During the Joint Arbitration Board Meeting, an inference was made that Jenni, Inc. has failed to pay contributions for hours worked by its bricklayers. Pursuant to the Settlement and Dispute Provision of the Collective Bargaining Agreement, only grievances raised by the Union with the Employer are subject to arbitration. The Union never filed a grievance with Jenni, Inc. whereby the Union made a claim that Jenni, Inc. failed to make contributions for hours worked by its bricklayers under Article [VII,] Section 7.4. In accordance with the express terms of the Collective Bargaining Agreement, since this grievance was not raised by the Union and more than 90 days had passed, any such grievance shall be deemed waived and not subject to being processed under the agreement.

> More importantly, Jenni, Inc. has been audited. The results of the audit show that Jenni, Inc. has complied with its obligations.

> The Union is improperly attempting to make Jenni, Inc. pay contributions based upon estimates made by business agents. Apparently, business agents are going out to jobs, counting bricks and dividing them by square feet and coming up with

hours that should have been paid by Jenni, Inc. Clearly this procedure is not called for or permitted by the Collective Bargaining Agreement. Specifically, the agreement provides in Article 25.4(c) for the Union to ascertain actual starting and quitting times, visit the job site for five (5) working days, once in the morning and once in the evening and to follow the remaining procedures set forth therein. The Union is attempting to unlawfully rewrite this Article which is clearly improper. This is not what the parties bargained for in the contract. The audit also shows that the Union's actions are erroneous and unwarranted.

Please immediately forward this to all members of the Board and provide me with advance notice of the next meeting so that I have time to clear my schedule and attend.[12]

(1/10/01 Holzman Letter, at 2-3.) There was not, however, any further meeting of the JAB. (Pls. Stmt. ¶ 83; Defs. Response Stmt. ¶ 83.) Defendant notes that Holzman failed to respond within two weeks of December 18, 2000, and that even the January 10 Letter did not provide any factual material in support of Plaintiff's position on the section 7.4 under-reporting claim. (Defs. Response Stmt. ¶ 83; 1/10/01 Holzman Letter.)

By letter of February 14, 2001, the District Council served on Plaintiff a written decision signed by the JAB members. (2/14/01 Letter from Marinopoulus to Jenni ("2/14/01 Marinopoulos Letter"), Ex. D to Defs. Stmt.; Written Award.) The written decision found that Plaintiff violated sections 4.1, 5.1, and 7.4 of the Agreement and awarded damages in the amount of $5,620.00 for the section 4.1 violations and $58,662.94 for the section 7.4 under-reporting claim. (Written Award, at 2-4.) The damages on the second claim were based on the JAB finding that Plaintiff performed at least 2,080 hours of work in violation of the Agreement. (Written Award.) Plaintiff was thus ordered to make fringe benefit fund contributions for all such hours, and to pay amounts equal to the fees and dues which would have been paid had such work been done as per the Agreement. (Id.) In addition, Plaintiff was ordered to pay further "lost wages damages" equal to two-thirds of the hourly rate that would have been paid to bargaining unit members for the 2,080 hours. (Id.) The JAB ordered the award to be divided among the Local 21 Welfare and Pension Fund, the

---

[12]     The record is silent as to whether the January 10 Letter was in fact forwarded to the JAB members.

District Council, and various fringe benefit funds. (*Id.*)

The Written Award was signed by the JAB members, but they did not draft it themselves. (Mieliuis Dep. at 69, 71, 74-75; 80-81; Lauber Dep., at 20-22.) Instead, after the hearing, on December 26 or 27, 2000, Mieliulis prepared a draft of the written decision using a form that has been stored on her computer since at least 1996. (Mieliulis Dep., at 69, 71, 74-75, 80-81.) To prepare the draft, Mieliulis typed in certain case-specific details, including party names, dates, hours and amounts. (*Id.*) In its oral decision on December 18, the JAB had not awarded any damages for violations of section 4.1, but Mieliulis's draft listed section 4.1 as one of the violated provisions and included a damage award for initiation fees and dues, which was ratified by the JAB when they signed the Written Award. (*See* Written Award; Mieliulis Dep., at 80.) Mieliulis also included a paragraph directing that amounts to cover the award be recovered from Plaintiff's bond if payment was not otherwise made, and warning Plaintiff that it must post a replacement bond or cease work within the District Council's jurisdiction. (*Id.*, at 81; Written Award.)

After completing the draft, Mieliulis forwarded it to the Union's lawyer, Barry Bennett, for his review. (Mieliulis Dep. at 117-19.) Bennett suggested two changes: adding a paragraph noting that the case had originally been set for October 25 but was continued to December 18 at Plaintiff's request, and adding a few words concerning the need for Plaintiff to provide a replacement bond if the damages awarded reduced the amount of its existing bond. (*Id.*, at 111-13; 117-19.) Mieliulis made these changes without consulting any JAB members. (*Id.*, at 119.) In fact, she did not consult with any of the JAB members nor with Plaintiff in preparing the Written Award. (*Id.* at 83-84, 99, 119.) After making the changes suggested by Bennett, Mieliulis sent the document back to him for a final review on Tuesday, January 2, 2001. (*Id.* at 122, 126.) Bennett called Mieliulis that same day and told her it was ready to circulate to the JAB members. (*Id.*, at 122-23.) She did so in January 2001, and the JAB members signed the Written Award as she had prepared it,

without making any further changes.[13]  (*Id.,* at 79.)

Marinopoulos indicated in the February 14, 2001 letter transmitting the Written Award to Plaintiff that Defendant had waived the right to recover under the $5,620.00 award for damages based on the section 4.1 claim (initiation fees and dues for specific individuals).   (2/14/01 Marinopoulos Letter.)  Plaintiff has not complied with the remaining provisions of the JAB award. (Defs. Stmt. ¶ 26; Pls. Response Stmt. ¶ 26.)

## DISCUSSION

**A.    Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *ANR Advance Transp. Co. v. Int'l Bhd. of Teamsters, Local 710*, 153 F.3d 774, 777 (7th Cir. 1998).  The court will construe the facts in the record and all inferences which may be drawn from them in the light most favorable to the non-movant. *ANR Advance*, 153 F.3d at 777.

Arbitration awards arising out of collective bargaining agreements may be challenged under § 301 of the Taft-Hartley Act, 29 U.S.C. § 185. *See Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 184 (7th Cir. 1985).  This provision provides a federal remedy for breaches of collective bargaining agreements, but it does not establish standards for judicial review of arbitration decisions. *See id.*  The Supreme Court has made it very clear, however, that "[j]udicial review of a labor-arbitration decision pursuant to [a collective bargaining agreement] is very limited." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001).  Thus, although courts will not permit an arbitrator to "dispense his own brand of industrial justice," his award will not be

---

[13]      The court notes that two weeks from December 18, 2000 was Monday, January 1, 2001. Although Mieliulis did not wait two weeks to draft the Written Award, she did wait at least two weeks before circulating it to the JAB members. Thus the JAB members could not have signed the award prior to the expiration of the two-week window they had given Plaintiff.

disturbed so long as it "draws its essence from the collective bargaining agreement." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). In one of its stronger statements on the limits of review in this context, the Seventh Circuit has noted:

> As we have said too many times to want to repeat again, the question for decision by a federal court asked to set aside an arbitration award—whether the award is made under the Railway Labor Act, the Taft-Hartley Act, or the United States Arbitration Act—is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract.

*Hill v. Norfolk and Western Ry. Co.*, 814 F.2d 1192, 1194-95 (7th Cir. 1987).

These principles were most recently affirmed by the Seventh Circuit in *Anheuser-Busch, Inc. v. Beer, Soft Drink, Water, Fruit Juice, Carbonic Gas, Liquor Sales Drivers, Helpers, Inside Workers, Bottlers, Warehousemen, School, Sightseeing, Charter Bus Drivers, Gen. Promotions Employees, and Employees of Affiliated Industries, Maltster, Laborers, Syrup, Yeast, Food, Vinegar, Brewery, Recycling and Miscellaneous Workers of Chicago and Vicinity, Ill. Local Union No. 744*, 280 F.3d 1133 (7th Cir. 2002) *petition for cert. filed*, 71 U.S.L.W. 3117 (June 26, 2002). The court simply will not consider whether the arbitrator misread the agreement; "the fact that a court is convinced [the arbitrator] committed serious error does not suffice to overturn his decision." *Anheuser-Busch*, 280 F.3d at 1137 (quoting *Garvey*, 532 U.S. at 509). The merits of the arbitrator's decision are not open to judicial review. *Id.* at 1137-38, 1138 n.2.[14]

Respect for the parties' contract requires these stringent limits on judicial review, else arbitration would become merely a starting point for litigation. *Carpenter Local No. 1027 v. Lee*

---

[14] The *Anheuser-Busch* panel split 1-1-1, with Judge Coffey writing the decision, Judge Rovner concurring in the judgment, and Judge Easterbrook dissenting. Although the facts of the case splintered the panel, all three judges agreed on the legal principles involved. At bottom, the essential disagreement between Judges Easterbrook and Coffey concerned whether the arbitrator made "an effort to interpret the contract" in reaching his conclusion, or rather engaged in some sleight of hand to reach an outcome he preferred. *See* 280 F.3d at 1142 (Judge Coffey quoting Judge Easterbrook's dissent). Judge Rovner agreed with Judge Coffey's conclusion that the arbitrator based his decision on improper considerations, given the contract's very explicit integration clause, but she disagreed with Judge Coffey's conclusion that the arbitrator intentionally disregarded the contract. *See id.* at 1146 (Rovner, J., concurring).

*Lumber and Bldg. Material Corp.*, 2 F.3d 796, 798 (7th Cir. 1993). Nonetheless, as a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (quoting *United Steelworkers of Am. v. Warrior & Gulf Co.*, 363 U.S. 574, 582 (1960)).

## B. Waiver

Defendant argues that Plaintiff has waived its arguments regarding the JAB's jurisdiction and bias by failing to raise those issues before the JAB itself. (Defs. Motion at 9.) Defendant relies on *National Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 960-61 (7th Cir. 1993), which holds, "Failure to present an issue before an arbitrator waives the issue in an enforcement proceeding. Parties . . . cannot stand by during arbitration, withholding certain arguments, then, upon losing the arbitration, raise such arguments in federal court." Plaintiff admits that a party cannot withhold arguments during arbitration and then expect a court to entertain them. (Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (hereinafter, "Pls. Response"), at 5.) Plaintiff argues, however, that insofar as waiver is an intentional relinquishment of a known right, (*id.* (citing *Miller v. Willow Creek Homes, Inc.*, 249 F.3d 629, 631 (7th Cir. 2001)), and it did not voluntarily submit the section 7.4 claim to arbitration, it did not waive any of its arguments.

The parties dispute whether *Walters Sheet Metal Corp. v. Sheet Metal Workers Local 18*, 910 F.2d 1565 (7th Cir. 1990), originally cited by Defendant, is "particularly relevant." (*See* Union's Reply Memorandum in Opposition to Company's Motion for Summary Judgment (hereinafter, "Defs. Response"), at 3; Plaintiff's Reply Memorandum in Support of its Motion for Summary Judgment (hereinafter, "Pls. Reply"), at 5.) *Walters* supports contentions made by both parties insofar as it held that a court will not consider procedural arguments that were not raised during the arbitration, but also noted that a party cannot waive a right of which it has no knowledge. *See id.*, 910 F.2d at 1567.

Plaintiff argues that because it did not submit the under-reporting claim to the JAB

voluntarily, it may now argue that the JAB did not have the authority to resolve it. (Pls. Reply, at 3.) In this court's view, however, this argument fails if, as in *Jones Dairy Farm v. Local No. P-1236*, 760 F.2d 173, 175 (7th Cir. 1985), which was cited by Plaintiff, Plaintiff "did not . . . challenge the arbitrator's jurisdiction, and make clear that it was preserving its challenge for eventual presentation to a court if the arbitrator ruled in the union's favor . . . ." Although unreservedly submitting to arbitration means that a party cannot challenge the arbitrator's jurisdiction to a court, the fact that a party had reservations is unavailing if the party fails to make any jurisdictional challenge before the arbitrator.

At the December 18 hearing, when given an opportunity to respond to Fialkowski's allegations and evidence, Holzman told the JAB that he did not know the matters raised by Fialkowski were going to be discussed at the hearing. Holzman stated that he was not prepared to respond to any of the claims made by Fialkowski and asked for a continuance. Plaintiff claims Henry Kramer, a Union mediator, told him to "shut up . . . this is what we're doing." Holzman may not have waived any arguments by failing to present them that night, but that is not what the court must decide here.

The issue is whether Plaintiff waived its jurisdictional and bias arguments by not making them to the JAB within the two-week period after the hearing. The JAB invited Holzman to submit material or information within that two-week period, but he did not do so. Instead, Plaintiff did not challenge the jurisdiction of the JAB until January 10, 2002, more than three weeks after the December 18 hearing. Plaintiff does not make any attempt to justify its failure to file objections, evidence, or anything else with the JAB within two weeks of the hearing. It is apparent from the January 10 Letter that Holzman contemplated bringing his jurisdictional arguments to the JAB itself; he had not given up and resigned himself to litigation in the courts. Nor has Plaintiff suggested that it had no time to prepare the objections; if, for example, the busy holiday season created difficulties, Holzman presumably could have made an attempt to request more time from the JAB. Instead Plaintiff offers no legitimate justification for not raising its objections to the JAB in a more timely

fashion.

In short, even assuming, in the Plaintiff's favor, that the JAB had only expressed a willingness to reconsider a relatively small portion of the under-reporting damages it awarded on December 18 (discussed more fully below), Plaintiff's failure to attempt to raise objections available to it from the face of the contract within two weeks of the hearing means Plaintiff has forfeited the opportunity to do so here. *See Pokuta v. Trans World Airlines, Inc.*, 191 F.3d 834, 839-40 (7th Cir. 1999) (airline's attorney sent arbitrator an unflattering letter about plaintiff while her claim was pending; but plaintiff waived the argument that counsel's letter tainted the outcome by failing to object in the month between finding out about the letter and the issuance of the board's decision). Plaintiff in this case has waived its argument that the JAB exceeded the authority granted to it by forcing Plaintiff to pay contributions based upon a third-party estimate of the work performed on job sites. (Pls. Motion, at 9-10.)[15] Plaintiff's argument that the claim was not brought within 90 days is also waived. The court must also assume the JAB found whatever notice Plaintiff was given and whatever attempt the parties had made to resolve the dispute before presenting it for arbitration (or lack thereof) was enough to satisfy the terms of the 2000 Agreement.[16]

With respect to the remaining arguments challenged by Defendant – that the claim was not brought by the Union and that the JAB was biased or partial in favor of the Union – Plaintiff argues that it lacked the knowledge necessary to bring these to the JAB in the first instance. (*See* Pls. Response, at 6.) That is, Plaintiff argues that it did not know Fialkowski was not employed by the Union, nor did it know about the facts underlying its bias allegations. The court assumes without

---

[15]    The court suspects such an argument would fail in any event. The parties' agreement provides the JAB with "full power to enforce" the terms of the Agreement and impose whatever remedies it deems appropriate. (2000 Agreement, Art. XII, section 12.7.) *See Anheuser Busch*, 280 F.3d at 1138 (the reviewing court does not review the "correctness" of the decision); *see also United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987) ("where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect").
[16]    This conclusion makes moot the parties' dispute about whether the October 10 Letter is a "grievance" for violations of sections 5.1 and 7.4.

deciding that Plaintiff's claimed lack of knowledge is a sufficient excuse and addresses these two remaining arguments as part of the discussion below.

## C.    Jurisdiction

Defendant argues that summary judgment in its favor is appropriate because the JAB award complies with the very modest requirements for enforcement.   First, where the JAB found specifically that Plaintiff had violated three provisions of the contract, its decision is necessarily a matter of contract interpretation.   Moreover, although "neither good reasoning nor solid logic is required," Defendant argues, the JAB's actions and decisions were both reasonable and logical. (Defs. Motion, at 13.)

Plaintiff disagrees, arguing that the JAB exceeded its contractual authority by hearing a claim against Plaintiff that was not brought by the Union.   In memoranda filed in regard to Defendant's motion for summary judgment, the parties spent a considerable amount of space on *Sullivan v. Lemoncello*, 36 F.3d 676 (7th Cir. 1994).   Defendant argues that the award upheld in *Sullivan* is similar to the one at issue here and Plaintiff points to a number of essential differences.

*Sullivan* involved an employer found to have used non-union employees to perform bargaining unit work.   In two decisions, the arbitration panel ordered the employer to pay compensatory damages of roughly $23,100 and fines and interest of roughly $22,300.   Both claims appear to have been brought to arbitration by a union trust fund representative. *See* 36 F.3d at 679-80.   The court rested its decision upholding these awards on the employer's failure to file a timely motion to vacate or modify them, but considered and rejected the employer's argument that the fines imposed on it were not rooted in the collective bargaining agreement. *Id.* at 682.   The court noted that the parties' agreement gave the arbitrators broad power to fashion remedies: The agreement provided that the board "shall have full power to enforce this Agreement against offending employees and/or Employers by appropriate penalties or remedies including, without limitations, fines, replacement of defective work without pay, or other appropriate sanctions." *Id.* at 683 (quoting from collective bargaining agreement).

The court finds the *Sullivan* decision less significant than do the parties. Unlike *Sullivan*, this case does not involve a statute of limitations issue. In addition, the *Sullivan* employer's main challenge was to the very large punitive damages imposed by the board. In this case, the remedy provision in the parties' 2000 Agreement provides, like the provision at issue in *Sullivan*, that the JAB "shall have full power to enforce this Agreement," imposing whatever remedies it deems appropriate. (Art. XII, section 12.7, 2000 Agreement.) Plaintiff does not argue that the damages assessed for the section 7.4 violations are illegitimate as punitive, however, and such an argument would likely be unsuccessful in light of the plain language of section 12.7 and Plaintiff's failure to make the argument to the JAB.

Both parties were no doubt drawn to *Sullivan* because the dispute at issue was between the employer and the union's trust funds. The *Sullivan* plaintiffs included a representative of the trust funds, a non-profit corporation, and the individual members of the arbitration board. The court noted, "[the employer] was a party to a collective bargaining agreement with the Union, and the plaintiffs are all associated with the Union." 36 F.3d at 679. The contract in *Sullivan* was arguably slightly more ambiguous than the 2000 Agreement at issue here, but in *Sullivan* the employer did not attack the award on the ground that the claims had not been brought by the Union. Thus, the case provides no particular guidance on this issue.

Assuming that the Association Agreements bar Fialkowski from bringing a dispute with Plaintiff to arbitration, the court concludes there is no genuine dispute of fact that the Union brought the section 7.4 claim.[17] Plaintiff is correct that Fialkowski was not asked by anyone from the Union to attend either the October or the December JAB hearing, and he did not tell anybody that he

---

[17]    Plaintiff relies on *Carpenters Local No. 1027 v. Lee Lumber & Bldg. Material Corp.*, 2 F.3d 796 (7th Cir. 1993), for its argument that the JAB award is not enforceable if the claim was brought by Fialkowski. In *Carpenters Local No. 1027*, the court concluded that the arbitrator exceeded his contractual authority by not only ordering the employer to pay back pay to a reinstated employee, but also ordering the union to reimburse the employer, thus effectively deciding a claim that was not and could not be presented before him. *Id.* at 799-800. Given the court's conclusion that the claim was not Fialkowski's, the issue of whether *Lee Lumber* would otherwise control is moot.

planned to attend the hearings. It is also undisputed that Fialkowski was the only person who made a presentation about Plaintiff's "obligations for fringe benefits and lost wage damages," and that Fialkowski referred to the claim as his own in his deposition. The notice of hearing sent to Plaintiff, which advised that the JAB would consider claims that Plaintiff was "in violation of Article IV, Section 4.1; Article V, Section 5.1; and Article VII, Section 7.4," was signed by Marinopoulos, however. In addition, Marinopoulos declared that a claim is made by the District Council or one of its Locals no matter who brings the issues involved to the District Council's attention. (Marinopoulos Decl., attached to Defs. Response Stmt., ¶ 6.)

The fact that Fialkowski gathered the evidence and performed the calculations necessary to support a claim under section 7.4 of the 2000 Agreement does not make it "his" claim rather than the Union's. One way or another (though the record is not clear exactly how), the Union knew enough to advise Plaintiff that a claim against him under section 7.4 would be brought to the JAB, and the Union knew enough to give Fialkowski notice of the hearing dates so that he could appear and present the evidence for the section 7.4 claim. In sum, the record is insufficient to counter the common-sense assumption, shared by everyone at the December 18 hearing, that Fialkowski presented evidence to the JAB regarding a Union claim that Plaintiff was in violation of section 7.4.

As discussed above, Plaintiff's other jurisdictional arguments have been waived for failure to present them to the JAB in the first instance. Plaintiff's motion for summary judgment on jurisdictional grounds is denied, and the court finds there is no jurisdictional impediment to summary judgment for Defendant.

## D. Fairness

Plaintiff's second argument is that the JAB award is unenforceable because the JAB failed to afford Plaintiff a fundamentally fair hearing. Plaintiff contends that it was not given an opportunity to refute the claims made by Fialkowski, at or after the hearing. Plaintiff also argues that Kramer had no right to attend the hearing and that Fialkowski refused to respond to Holzman's request about the reasons underlying Fialkowski's actions in visiting job sites. Plaintiff argues that

the JAB refused to grant Holzman a continuance and went ahead to resolve Fialkowski's grievance on December 18. Finally, Plaintiff objects to Fialkowski's "underhandedly" coming up with pictures, documents and estimates at the December 18 hearing without providing Holzman an opportunity to review the material beforehand.

As Defendant admits, there is a genuine dispute of fact as to whether Plaintiff asked the JAB for a continuance. (Union's Reply Memorandum in Support of Motion for Summary Judgment, at 10.) In addition, there is a genuine dispute of fact as to whether the JAB gave Plaintiff a two-week opportunity to present information and evidence regarding all elements of the award, or rather indicated its willingness to reconsider only a relatively small piece of the award.[18] For purposes of Defendant's motion, the court assumes that Plaintiff did ask for a continuance and that the JAB expressed a willingness to reconsider only the portion of the award having to do with hours worked to wash the bricks.

Although he had no advance notice concerning the dispute and presumably could not have prepared to rebut the claim, it is undisputed that Holzman was given an opportunity to respond to Fialkowski's allegations and evidence at the hearing itself. He told the JAB that he did not know

---

[18]     Plaintiff argues that it was given time only to submit documentation, and only such documentation as would show that certain brick washing work was not performed by Plaintiff (Pls. Reply Stmt. ¶ 71.) That is, Plaintiff argues that the JAB had expressed no willingness to revisit any other portion of the award. (See id.) Defendant argues the JAB put no such restriction on the portions of the award it was willing to reconsider. (Defs. Response Stmt. ¶ 74.) The parties cite Larsen's testimony, Fialkowski's testimony, and notes taken by Mieliulis during the December 18 hearing to support their positions.

Larsen testified that he did remember the JAB telling Holzman that Holzman could provide evidence within two weeks that Plaintiff's employees did not do the washing work. (Larsen Dep., at 28, 51-51.) Larsen went further, however, and testified that the JAB gave Holzman the opportunity to submit "any other evidence that he might be able to provide the Board that would in any way change the Board's decision." (Larsen Dep., at 52.) Fialkowski also highlighted the washing work, but made statements that support Defendant's contention the JAB did not limit the issues it was willing to revisit. (See Fialkowski Dep., at 74, 124.) Mieliulis made a note in the remedies section of the December 18th Violation Sheet, "Washing is not part of it – show proof – and take out" and "Taking washers out – 1994.32 hrs. owed on. 4/00 – 10/00." (December 18th Violation Sheet.) Mieliulis's notes suggest she anticipated deducting the hours charged for the washing work if Plaintiff could show proof it was not part of the job, but do not indicate the JAB might reconsider the entire award.

the matters raised by Fialkowski were going to be discussed at the hearing, stated that he was not prepared to respond to any of the claims made by Fialkowski, and asked for a continuance. The continuance was not granted, but Plaintiff was given a two-week window to put evidence or arguments in front of the panel and made no attempt to do so.

Without that two-week window, the JAB decision on December 18 might be characterized as an improper entry of default judgment against Plaintiff. Because of that two-week opportunity to present evidence and arguments to the JAB, however, *Chicago Truck Drivers v. Denton Cartage Co.*, 648 F.Supp. 1009 (N.D. Ill. 1986), cited by Plaintiff, is inapposite. In *Denton Cartage*, employer representatives arrived on time for a scheduled hearing but, after waiting two and a half hours for the panel to call the case, informed a union official that the case would have to be rescheduled because they had another appointment to attend, and left. *Id.* at 1010. When the case was called soon after, a union representative told the panel that the employer had left and would not be participating in the proceeding. *Id.* The panel entered a judgment against the employer, and the employer's motion to reconsider failed at a subsequent hearing when the panel divided evenly over whether to grant it. *Id.* at 1010-11. The court held that "the decision to enter a default against [the employer] and to deny reconsideration of that decision violates the fundamental public policy of ensuring due process in legal disputes . . . ." *Id.* at 1012. In this case, the time given Plaintiff to challenge the December 18 ruling was unquestionably brief, but Plaintiff failed to so much as ask for more time, much less present the JAB with any basis on which to rule in Plaintiff's favor.

Plaintiff notes that the court has the authority to vacate an award if the arbitrators, among other things, refuse to hear material evidence. (Pls. Motion, at 11 (citing 9 U.S.C. § 10(3) and *Teamsters, Chauffeurs, Warehousemen, and Helpers, Local Union No. 506 v. E.D. Clapp Corp.*, 551 F.Supp. 570 (N.D.N.Y. 1982), *aff'd* 742 F.2d 1445 (2d Cir. 1983).) In *E.D. Clapp*, an arbitration award was vacated because the union was not given an opportunity to complete its presentation of proof after a hearing ended abruptly because of disturbances from one or both of the parties.

*See* 551 F.Supp. at 577-78. Here, however, even though the scope of the JAB's invitation to challenge its ruling was presumably narrow, Plaintiff never gave the JAB the opportunity to refuse to consider any evidence. *See Pokuta*, 191 F.3d at 840 (rejecting as insufficient excuse for not raising an argument to the arbitration panel that the record was closed and the parties had already submitted post-hearing briefs.)

Plaintiff also objects to Kramer's presence at the hearing. Defendant acknowledges that the Agreements do not specifically provide for the presence of a mediator, but notes that they also do not prohibit it. (Defs. Response Stmt. ¶ 35.) Kramer has for several years attended JAB sessions as a mediator. He introduces the parties, attempts to maintain order, makes sure everyone is able to say whatever they want, and then asks everyone other than the JAB panel to leave the room, at which time he leaves with them. (Defs. Response Stmt., Additional Facts ¶ 14.)

In *United Food and Commercial Workers Int'l Union v. SIPCO.*, 8 F.3d 10 (8th Cir. 1993), cited by Plaintiff, the Eighth Circuit affirmed a trial court's ruling that the misconduct of the arbitrator—allowing representatives of a non-party labor organization to attend the hearing, considering its interests in resolving the dispute between the parties, engaging in *ex parte* communications with the non-party union, and considering facts not presented in connection with the dispute—was grounds to vacate the award. *Id.* at 10. Allowing Kramer to attend and introduce the parties, even assuming he did at one point tell Holzman to shut up so the JAB could go ahead and consider the dispute, does not come close to the misconduct in *Sipco*. To the extent that Kramer's presence violated procedural rules, the court notes that he was also present at the October 25 hearing, (Pls. Stmt. ¶ 35), which put Plaintiff on notice of the need to object at the December hearing. Holzman did not do so. In fact, Plaintiff never complained to the JAB or the Union about Kramer's presence, and thus may not do so now. *Nat'l Wrecking*, 990 F.2d at 960-61.

Plaintiff's argument that it was given no meaningful opportunity to defend itself because of insufficient notice and the JAB's refusal to grant a continuance would have merit, except for the Plaintiff's complete failure to take advantage of the opportunity it was given to defend itself after

the fact. The court is sympathetic to Holzman's decision not to bring an attorney to the December 18 hearing because he thought he was facing a $5,000 claim, not a $50,000 claim. (*See* Pls. Response, at 9.) By the end of the hearing, however, Holzman knew the Union had prevailed on the section 7.4 claim, and did nothing for more than two weeks. Given the extremely limited review this court is empowered to give arbitral decisions like this one, the court cannot say that the JAB violated the terms of the agreement by reaching a decision at the December 18 hearing despite the lack of substantive notice to Plaintiff. *See Anheuser-Busch*, 280 F.3d at 1138 n.2 (the reviewing court does not review the "correctness" of the decisions).

As noted, Plaintiff objects to Fialkowski's "underhanded" conduct in presenting with pictures, documents and estimates at the December 18 hearing without providing them to Holzman beforehand. (Pls. Motion, at 12.) Plaintiff argues that Defendant's failure to provide in advance the evidence relied on by Fialkowski and presented to the JAB at the December 18 hearing violated basic notions of fairness. (*Id.*) Plaintiff cites no cases, and the court is aware of none, to support the position that this is grounds for vacating an otherwise legitimate award. The passages from Elkouri & Elkouri, HOW ARBITRATION WORKS (5th ed. 1997), 218, 322), cited by Plaintiff, show at most how arbitration is typically handled and how the authors feel it ought to be handled. (Pl. Reply, at 12.) Although the court has no quarrel with the proposition that pre-hearing communication regarding the details of the claims is preferable to surprise, arbitration is primarily a matter of contract. Plaintiff points to no contractual provision requring advance notice of evidence to be offered at an arbitration hearing, and the court will not impose such a requirement, however salutary.

In short, the strongest element of Plaintiff's argument comes from section 12.1 of the contract, which provides that disputes are subject to arbitration only if the Union and Employer are unable to resolve them within 72 hours. This is, however, an argument Plaintiff should have presented to the JAB within the two-week window after the hearing, and which Holzman only implied in his January 10 Letter. The court cannot entertain a matter of contract interpretation that

27

should have been, but was not, presented directly to the JAB in a timely fashion.

The hearing afforded Plaintiff was arguably not a model of deliberative procedure. Even assuming the hearing ran afoul of the parties' agreement in some way, however, it did not rise (or sink) to the level of fundamental unfairness given Plaintiff's actions. Plaintiff's motion for summary judgment on the ground that the hearing was fundamentally unfair is denied.

## E.     Bias

Plaintiff's final argument is that the JAB was biased or partial in favor of the Union. Plaintiff contends that the totality of the circumstances show that the outcome was controlled by the Union, not the JAB. In particular, Plaintiff contends that Lauber should have disclosed that Marinopoulos told Mieliulis to contact him to serve on the JAB. In Plaintiff's view, Lauber should have disclosed that Fialkowski had interviewed with and reported to him, and the JAB members should have disclosed that they had known the Union representatives for several years. In addition, Plaintiff asserts that Mieliulis's and Bennett's involvement in the preparation of the Written Award was improper.

Although it is not from this Circuit, the court finds the facts and reasoning of *Sheet Metal Workers Int'l Assoc. Local No. 162 v. Jason Mfg., Inc.*, 900 F.2d 1392 (9th Cir. 1990), worth noting. In that case, the court determined that the bias alleged was inherent in the board's being comprised of representatives of the businesses with which the claimant was in competition and representatives of the same union with which the claimant's dispute arose. The court found that, because the claimant had contracted to have disputes resolved before such a panel, it had therefore consented to the composition of the very panel it was challenging. *See* 900 F.3d at 1398. This court similarly rejects Plaintiff's allegations of bias to the extent that, as Defendant puts it, "[t]he claim by [Plaintiff] that the panel was biased is nothing more than a claim that a joint panel system of this sort is inherently and necessarily biased because the management appointees compete for business with employers whose cases they help decide, and the labor appointees are part of the organization that is pursuing the claim." (Defs. Response, at 11.)

In *Sanko S.S. Co. v. Cook Indus., Inc.*, 495 F.2d 1260, 1262 (2d Cir. 1973), cited by Plaintiff, an arbitrator had disclosed that the company of which he was president had business dealings "of a spot nature" with one of the parties (Cook Industries). The other party, Sanko, later discovered that the arbitrator's company was a subsidiary of one of Cook's competitors, Dreyfus. *Id.* After the arbitration, the arbitrator in question allegedly went to Europe to head a second Dreyfus subsidiary. *Id.* Because Dreyfus and Cook are two of the few major world grain dealers, and allegedly arrange "swaps" or "sales" from time to time running into the millions of dollars, Sanko argued that the arbitrator may have had an interest in reaching a decision favorable to Cook to lay the groundwork for a return favor to Dreyfus later. *Id.* Moreover, Sanko claimed that the arbitrator's company had been represented for some time by the attorney Cook had retained for the arbitration. *Id.* In light of these allegations, the court ordered a full evidentiary hearing regarding the arbitrator's business connections with Cook and Cook's counsel. *Id.* at 1263.

The *Sanko* court relied on a Supreme Court decision requiring arbitrators to disclose "any dealings that might create an impression of possible bias." *Sanko*, 495 F.2d at 1263 (quoting *Commonwealth Coatings v. Cont'l Cas. Co.*, 393 U.S. 145, 149 (1968)). In *Commonwealth Coatings*, the Supreme Court vacated an award based on an arbitrator's failure to disclose that he had had repeated dealings involving significant fees with one of the parties over a period of four to five years, which even included services rendered on the very projects at issue in the arbitration. *See* 393 U.S. at 146, 150. Justice White noted in his concurrence, however, that "arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial." *Id.* at 150.

The relationships that the Larsen and Lauber failed to disclose are too trivial to undermine the legitimacy of the award.

> [T]he mere fact that there was some prior business relationship between [a party representative] and [the arbitrators] is not in and of itself sufficient to disqualify them as arbitrators . . . the relationship between the arbitrator and the party's principal

must be so intimate—personally, socially, professionally, or financially—as to cast serious doubt on the arbitrator's impartiality.

*Health Servs. Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1264 (7th Cir. 1992) (internal quotation marks omitted); *see also Tamari v. Bache Halsey Stuart Inc.*, 619 F.2d 1196, 1200 (7th Cir. 1980) ("[t]he interest or bias of an arbitrator must be direct, definite and capable of demonstration rather than remote, uncertain or speculative").

Plaintiff also argues that the preparation of the JAB award was improper. Plaintiff notes that the Written Award was typed by Mieliulis, changes were made by a Union attorney, Mieliulis included damages against Plaintiff for dues and fees which were never awarded by the JAB, JAB procedures did not call for prior Union review, and the JAB never instructed Mieliulis to send the award to the Union for review. Plaintiff also argues that, if it was improper for Plaintiff to review the award before it was signed, as Larsen testified, the Union should not have been able to review it.

The court finds it troubling that the Written Award included damages for the Union's section 4.1 claims, damages which, it is undisputed, were not awarded by the JAB in its oral decision. The involvement of Union personnel in preparing a written version of the arbitrator's oral decision, however, is not enough to vacate the JAB award for the section 7.4 claim as a matter of law. *See Health Servs. Mgmt.*, 975 F.2d at 1264 (a party must show "more than a mere appearance of bias"). The Union has waived collection of the damages erroneously included for the section 4.1 claims, and thus the Union involvement in the preparation of the award had no substantive effect on Plaintiff's rights or obligations.

Although the panel members might have devoted more attention to the process, they had the opportunity to review the award and sign it only after satisfying themselves that it was consistent with the decision reached at the hearing. Moreover, there is no indication in the record that they did not decide the case honestly, particularly given Plaintiff's complete failure to provide the panel with any basis on which it could have ruled in Plaintiff's favor. Plaintiff's motion for summary judgment on the ground that the JAB was biased in favor of the Union is denied.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Doc. No. 22-1) is denied. As there are no material disputes to submit to a finder of fact and no basis on which to set aside the JAB award, Defendant's motion for summary judgment (Doc. No. 24-1) is granted.

ENTER:

Dated: August 27, 2002

REBECCA R. PALLMEYER
United States District Judge